Good morning, Your Honors, and may it please the Court, Gregory Keenan, appearing on behalf of InfoDeli et al. I'd like to reserve four minutes, if I may. Thank you. You'll need to watch, obviously. Of course. Thank you, Your Honor. This case is fairly complex in its history and length, but at core, it boils down to a relatively simple copyright dispute. In particular, we would posit that summary judgment dismissal on copyright was wrong for three central reasons. One was the evidence of verbatim copying of code and HTML, which should have precluded a dismissal for copyrighted summary judgment. Two, errors in assessing the copyrightability of the databases, particularly the database keys, which were the qualitative part of the work. And finally, in light of circumstantial evidence indicating that there had been complete replicas and duplicates according to defendant's own statements regarding scraping and creating replica versions of InfoDeli's websites. When you say code, correct me if I'm wrong, but my impression was that source code and object code were not at issue here. The district court did say that. However, InfoDeli did dispute that. They had argued, they had disputed it in a statement they had. They had introduced evidence from their own expert indicating that HTML code... I'm sorry, they did or did not? Did. Did. That HTML code for its website had been scraped, meaning copied, and there was evidence also in the record that there were downloads of the HTML code, which is copying. Respectively, we think that the district court just overlooked that, but that there is evidence in the record and that InfoDeli did argue below that there was verbatim copying of their source code and verbatim copying of the HTML code. Was that pleaded in the complaint? I'm not sure if HTML code was specifically teased out. I know the platform as a whole is a combination of the website, the underlying HTML that the copyright registrations are in. All of the registrations were for HTML. The registrations are in. It seems to me that literal copying is something fairly specific and that the complaint alleges substantial similarities. Maybe it's understandable why the district court didn't pick up on the argument. I'm wondering if you can change the argument from the allegation and the complaint that way through the pleadings. I'm sorry, through the motion practice. Sure. Two aspects of why I agree it's understandable. One, there's some inconsistent usage of the term literal copying versus copying of literal elements when it comes to computer software. And two, obviously the work is fairly complex and technical. I wouldn't frame it as a recasting of the allegation, though. The allegation is that the two works are infringing and that defendant came in and copied the website. So you had talked about the non-literal codes and the substantial similarity in the complaint. So is it your position that just alleging copying then subsumes other aspects of copying as well, even though it's not in the complaint? Is that your position? I'm sorry, could you reframe the... The complaint speaks of substantial similarity, the non-literal aspects. So what I'm understanding you to say is because you've alleged just copyright, that even though you didn't allege the verbatim copying, that that is subsumed in any copyright claim? No, I'm sorry, Your Honor. Literal copying or verbatim copying is just how one proves substantial similarity. It's just what substantial similarity is as a matter of law. So there are allegations that the website and the HTML was infringed, and then the way you would show that is do a side-by-side of the two works. And the term literal copying just means direct copying of creative expression. And so substantial similarity is not a different term? I would say that the demonstration of literal copying of creative expression is just a recognized way of demonstrating substantial similarity. For example, we reference the Supreme Court's Harper decision where they said verbatim copying of 300 words is infringement absent a fair use defense or some other affirmative defense. The showing of verbatim copying or literal copying, it's a term that's used interchangeably. It's just how you would demonstrate the strongest case of the substantial similarity between two pieces of expressive information. I'd also like to turn to the databases and the database keys in particular. One thing that we think the District Court erred in doing was over-dissecting the work in such a fashion as to remove the database keys or the inferential or referential integrity between the various tables in the database when conducting his analysis. Notably, defendants in their own statements acknowledged that when a software developer creates a referential integrity, that's a creative choice. And it's a creative choice about how to take two different tables or information within those tables and have them start interacting in certain ways to coordinate and arrange and select material so as to convey information to users in a way that makes the information in general more qualitatively significant, more valuable. Also, as to the circumstantial evidence, as to the complete replicas of the work, there were emails being exchanged by defendants, WRI and Engage, where WRI was saying, we need you to create a replica service that has identical features, particularly identical unique features. And then months later, in May of 2014, there's an email that's sent that says, we've accomplished the replication of the work. There's also the expert Jason Eady, who found in their own Google docs a statement with a date log saying, we completed the replication of the work. So there's evidence that they were, during a certain time period, trying to duplicate and trying to replicate the work. And there are emails and statements in their own internal notes indicating the date on which they accomplished that complete replication. So we would say, even though unfortunately the wholesale copies of the entire work were never produced, we believe that those copies were, in fact, were destroyed because defendants hadn't turned off auto-delete functions on their computers, and that there is evidence indicating that at a certain point of time they were both trying to make complete replicas and then confirmation that they had achieved doing that. So we think those are three separate bases, three separate demonstrations of things that should have precluded a finding of summary judgment on the content of those copyright claims. Did you concede or ask the court to use the AFC test? The parties, I think, agreed to use the abstraction filtration. So is your sort of holistic argument counter to sort of a true application of that step, three-step process? I think it is true to it for the following reason. The first step is where you're, what you're meant to do early on is to use a non-protectable expression. However, what is protectable is what is creative, what conveys information, what coordinates and arranges and selects data. And so we would just argue that in the step of doing that, by taking out that referential integrity or the database keys that tie it together, that was just removing something that should have been acknowledged, that referential integrity, which is the fancy term for database keys that ties all these tables together. It's a creative choice that a software developer is making, perhaps in the way that a musician is stringing together musical... This is obviously pretty complicated. And I think the key is getting to what is original. And you keep referring to these things, but what is it about those things that makes it original? Sure. Of course, Your Honor. So essentially, first of all, there's just no pre-ordained decision there. So take for instance... Because a database by itself is not going to be original, right? A database by itself I think could be original under this Court's info group, depending on if the selection of the information in the database is original or not. Go ahead, explain that to us. Sure. So essentially, take Feist as a study in what was not original. So if you did something in alphabetical order, right? That's just very uncreative, in part because it's been a standard employed by every single person making phone books. If you picked up a phone book not in alphabetical order, it would strike you as strange. Here, there's not a pre-ordained way of making connections between things in different fields. You can do it in any number of ways. It's one of the more creative choices that an engineer is making. In the same way that two authors are both picking up words from a dictionary, say, but they're stringing them together in different fashions, there's nothing that's demanding you do it in one fashion. It's also not something that's kind of pre-ordained by what you would call, like, scenes of fare or industry standard. So if there were a showing of that effect saying that this is the only way to do it, you might have some sort of affirmative defense that would have filtered something like that out under the abstraction and filtration test. But it's because it's a creative choice, you have many options. Here, in fact, the experts, because Mr. Burry is an autodidact, he kind of has idiosyncratic choices that are a little bit strange because he's self-taught, that you just wouldn't see and would strike someone as odd. So that's part of the creative decision as well. Can you maybe make a concrete example? If I'm using this database and I buy Ralston Purina dog food because of some story that's going to come up or something like that, can you give me something? Of course. Let's say I had a bunch of databases about every baseball game going back to 1900, batting averages, starting pitchers, all that. And now let's say I wanted to take all those databases and all this information and start connecting it such that I could start finding out all the left-handed pitchers who pitched on Wednesdays during rainy days on leap years. I could arrange the connections between the tables to yield all that information forward in a way that would reveal something interesting perhaps, but that would be a creative choice to start arranging those interrelations in that way. So I think it would be original both because it's a creative act, certainly has a modicum of creativity, also because it's doing arranging and selection and coordinating, and also because it's conveying information. And maybe I'm not quite understanding the complexity, but you've given a very specific example of perhaps a creative idea of what you want to find out. Here the example is I'm on the website and I want the chew toy, or I want the dog food. Then is it more of a direct, well, here's what you have to do? One thing that would be hard is so the databases and the interconnections are happening on the back end. So let's say I go to Amazon, for example, a website, and I type in chew toys or something. Well, what Amazon's actually going to do is bring me a certain set of chew toys based on things I've bought in the past. Maybe I buy red products more often. Perhaps Your Honor buys blue objects more often. They would know that, and on the back end, they start making these connections. Maybe I only buy things in the range of $20 to $30. Someone else likes to spend $50 to $60. Is that what's going on here? This one seems much more specific. It's a rebate, for example. They seem to be a more specific request, but I may not understand the complexity of the website. But is it analogous to the complexity of an Amazon-type search engine? Yes, and I would say just three quick points on that. One is the fact that it took so much money, $800,000 to try and replicate it, speaks to its complexity. Two, everyone started making a lot of money after they started using this, because revealing this type of qualitative information that's not obvious on the front end is really useful from a business perspective. And then third, the elegance from the front end is part of the simplicity. It's supposed to be user-friendly, while helping the businesses on the back end draw all these sorts of connections. So that you can, let's say a dog food company, if they could start figuring out how often your dog needs to buy food, or how frequently I buy food for my dog, and they're drawing these connections, or how much food, or how big my dog is, these types of connections are actually really useful and convey a lot of information. Selecting and coordinating thousands and thousands and thousands of data points, scattered across all these databases. We would just submit that clears the very modest bar, the modicum of creativity required by Feist. Mr. Keenan, because time's running low, I'd like to switch to the Rule 37E sanctions question. Could you tell me whether InfoDelhi received all of the database information that it requested, specifically for the period from August 7, 2014 through October of 2015? Did you receive all the database information that you requested in discovery? Your Honor, I don't have that at my fingertips, but I'd be happy to try and find that out before I get back up here. Well, the district court made some very specific findings regarding the delays in discovery responses, found that they were done in bad faith, basically, and to your prejudice. I don't see any findings by the district court as to what I believe are automatic deletions of databases during that time. That's right, but the discovery sanctions were not for spoliation. The discovery sanctions were for the slow playing, or the failure to... Right, but it's my understanding that on appeal you're asking for reversal and so I'm asking, were there any findings made as to spoliation during that period? Did you receive what you asked for? No, and I think the reason we're arguing for expanded sanctions or saying it was insufficient was because there was an ongoing process of not producing something, saying everything had been produced. It just really complicated the appeal, and the nature of the rule says that it must be a reasonable amount for what was caused, and I just want to give a very concrete example. Mr. Maddox, the attorney below, had to hire, and it's in the record, two technology experts only for this purpose of trying to figure out if they had gotten everything yet. That was the only reason that they were hired, and it cost him $50,000, and then the district court awarded $5,000 to compensate for that because that's what it cost them to write an affidavit detailing all that time. We would just say that's not actually tethered to the rule requiring the nexus to what was caused by it, and also it would just eviscerate the incentive functions to produce stuff when you're supposed to produce it. In your view, did the district court make all the factual findings that it needed to make regarding Rule 37? I don't think it made all the factual findings correctly for the following reason. It said this was discovery that would have had to be done anyway, and for two of those experts, we just know that's not true because they were hired solely for this purpose, while a separate expert was dealing with the other discovery issues. I also have a question on the award of attorney's fees. Yes, sir. Do you know if there's any precedent for awarding attorney's fees where only factor four of the Fogarty test was found in favor of fees? Not offhand, and I think that's in part because very rarely is someone advancing reasonable but losing arguments and then need to be punished heavily. The Supreme Court has clarified that reasonableness is not a complete insulator, but it's very unusual. You're only going to find it in outlier situations where someone is being very abusive. I'll rest if your honors have no further questions. Very well. Thank you, Mr. King. Thank you very much. Good morning, your honors. May it please the court. Chad Eggspieler on behalf of Beringer, Engelheim, Vetmedica, Inc., or BIVI. I'll be arguing the first and third appeals for up to 17 minutes, and my colleague Dan Bleggin will be arguing the contingent cross appeal for up to the remainder of time. Before I get started, I'd like to address three specific questions from the panel that I think shed light on a number of problems here. Specifically, Judge Grunder, your first question, you asked was there an issue of copied code? This is something that's appeared in the appellate briefing, but as we lay out in our response brief and we take a table, going through the purported citations below, there was not an argument with evidence of copied code below. My brother counsel mentions the expert talking about scraping of HTML, but if you look at the actual testimony at 16 Joint Appendix 319 and 320, their expert, Jason Eady, says specifically, not an issue of copied source code. They asked about HTML and the scraping. He said, well, there might have been JavaScript, but when asked, as you sit here right now, do you know if there was copied JavaScript? I don't know. Further, in other aspects of his testimony, responding to other claims of copied code, he said there wouldn't be copied code because the original and the replacement databases were written in separate computer programming languages. This gets into the specifics of literal and non-literal source code versus this structure, sequence, and organization of software. I don't want to get too complex there. Repeatedly, again and again, there were no instances of copied code. In their reply brief at page 35, they said there was this one instance where we mentioned copied code in our district court briefing. They referred to 14 Joint Appendix 255, which is page 89 of a 100-page summary judgment brief. If you look there in the actual language of what is said on that page, it talks about copying of data in the database. It makes one mention of what they say is copied HTML code. It refers generally to the Burry Declaration at paragraphs 5-17. No explanation of what's in the Burry Declaration at 5-17. In our briefing, we go down paragraph by paragraph. Those paragraphs in the Burry Declaration don't actually say copied code. The closest it gets is in paragraph 13, I believe, where he says initially copied code, but then when he explains what in the side-by-side images is the same, he says, well, it's the same images or it's the same field names. That's not copied code. Another thing to keep in mind when their only purported submission of copied code comes from Plaintiff Brett Burry is that the district court separately excluded part of his expert opinion because he was not qualified to opine on computer programming and other programs. The only thing he was knowledgeable about was his own platform. The district court struck those aspects of the expert report and programming plaintiffs have not appealed that. So there is no preserved instance of copied code. We feel very confident in our briefing. Breaking through what they argue is an argument of copied code below, it was not presented. Second, Judge Grunder, you asked if there were any concrete examples of these so-called creative database keys that they refer to. That's been a mystery. We're now almost in year 10 of this litigation and we still don't know what it is that they're referring to. The answer you get is a hypothetical about a baseball data tracking program. What the district court did was actually walk through the purported creative aspects of the platforms. They identified the field names in the product table. That's not minimally creative under Feist. They identified the names of file images and product numbers. The images of the defendant's products were given a random Arabic numeral dot JPEG name. This court's decisions in Toro and in West Publishing say that just giving something a number, a numbering system, that's not minimally creative. The district court also looked at the platform access rights values so certain customers could access certain products but this isn't like a grand Amazon.com marketplace. In fact, I find the analogy to selecting pet food for your pets interesting because the databases that were submitted in this case don't have to do with this. This is not an Amazon.com or an eBay or even a Target website where you can just pick products and the program says, you like this product, this is a five-star rated product, how is your shopping experience going? The two primary databases here, the BIVI Web Store and the SEVA Web Store, are basically inventories of their marketing material products for their own employees. They're not general consumer products. If you want to think about what is the technology that's actually in play here, it's kind of like a restaurant menu, if you will. But all the creative choices are coming from the restaurant and its chefs, the dishes, the names, the images of the dishes itself. Here, that would be the marketing materials. That's the defendant's products and it's the names of those products and they're given a random number and the images of the products themselves belong to the defendants, not to the programming plaintiffs. What you have here is putting that in a database. Is there some creative or original sense as to the way those things would be arranged? Your Honor, we submit no and again, we're nine years into this case, we haven't understood what programming plaintiffs submit is actually creative. We've tried to respond to everything that we think could be arguably creative and that's what we presented to the district court. It went through step-by-step those four aspects of the databases and said there was no minimal creativity. A good analogy is actually this court's 2002 decision in the schoolhouse case involving the Minneapolis-St. Paul marketing table of the different school offering and selections in their school districts. There, it actually takes Feist, which involved phone books and brings it a little bit into the modern technology age because in schoolhouse, we had a magazine publication of a very detailed database table of the different school offerings, the different subjects, the different athletic offerings, the different pupil-student ratios, etc. That was allegedly copied in a website. What we're seeing is these principles are being applied in the context of a computer software database. First, this court recognized in schoolhouse, and this comes from the Feist decision, that when the allegedly creative element is just a compilation of data, a database compilation, it's what Feist says is entitled to thin copyright protection. Then it goes through and it says simply putting the 17 athletic courses offered in these schools in this respective school districts, there's nothing minimally creative about it. That's the only efficient, functional place to put that information. The selection to include that information, which is decided by the schools, there's nothing creative. That decision's being made by somebody else, the school districts. From just a common sense point of view, if that's true and it's just non-creative data, why do you need to copy their platform rather than just starting over? I can't speak to the decisional process here that went into when the original platforms were shut down and WRI, who is fulfilling a processing role for the downstream companies, which is BIVI and SEVO, it's going to be the same marketing material products. It's the same images of those products and the same employees who have access to which and the companies is going to be the same. It's their information. It's their employees. There's no creative decision that's being proffered by the programming plaintiffs here. That's what this court recognized in Schoolhouse. Putting those offerings there, the fact that these are the class offerings, French, Spanish, German, mathematics, that's not something that's coming from the magazine that originally published the table. That's coming from the outside source. Here the outside source is BIVI. It's SEVO. It's their marketing materials. I'm not sure that answers my question as to why, if you've got the information, why not just recreate it? Why copy their platform? To answer your question and to fight the premise a little bit, there was no copied source code or object code. They haven't presented on appeal what would be the third possible type of copying that comes in under copyright protection, which would be structure, sequence, and organization or SSO. That's the other or the non-literal aspect that the Oracle decision from the Federal Circuit in 2014 dealt with. It involved both literal code copying and also non-literal elements. Neither are in play here. They're not making a structure, sequence, and organization argument on appeal. It's just focusing on the data. Time and time again, they come back to this concept that it's data. As this Court is well aware from Feist, from before Feist, data itself, individual facts, are not copyright protectable. It's the creative arrangement of that data. Counsel today still can't explain to us what is creative about it. It shouldn't be that difficult to demonstrate your technology and what did your client contribute to the creative process. That's why, actually, in the Schoolhouse decision, this Court says that acknowledging that copyright protection for a database is thin, it says that a competitor may take the bulk of the factual material from a pre-existing compilation without infringement. That's why, even though 56 of the 64 topics in Schoolhouse in the database table, or 87%, was allegedly copied, and this Court said it doesn't matter. There was also a substantial similarity aspect to the Court's ruling, but it said it's not copyright protectable. One of these things is not like the others, too. We've been talking about the BIVI Web Store and the SEVA Web Store, which are marketing materials. It's an inventory. Their employees can log in, these products make those orders, and WRI fulfills those orders. The SEVA Vector Rebate website is the third one. That's the one that's not like the others. It involved a rebate form. We submit that this Court's Reagan decision from earlier this year, which we submitted this past month in our Rule 28J letter, knocks out the SEVA Vector Rebate site. This is an empty form with different field entries, such as name, address, pet name, etc. In Reagan, it was a customer intake form for a car dealership. The content was a little bit different, but name, car model, mileage, etc. This Court explained that when it's an empty fillable form that's just a place for downstream people to fill in the information, that's not minimally creative under Feist. That knocks out the SEVA Vector Rebate aspect of their claims. Why does that matter? It's particularly damaging to their case because they have adopted this group pleading tactic. At page 30 of our response brief in footnote 9, we catalog these are the record citations that they offer that they say is copied code, or that they say is this aspect of their claim. They refer to all defendants, but if you dig down, it's either unclear what the evidence refers to at all, or it refers only to the SEVA Vector Rebate site. We point this out and say you can't point to evidence that involves the SEVA Vector Rebate site and say that applies to all these websites and all the defendants. We ask this court to narrow the funnel to the issues that are actually properly preserved. A number of them are not. They're either not appealed or they were never presented to the district court, and to reject this everything, everywhere, all at once approach that the programming plaintiffs have adopted in this case. Judge Gross, you asked one additional question there towards the end about the Rule 37E spoliation and preservation of evidence issues. And there's a very specific answer to your question did they receive all the databases that they requested? They told the district court yes, they had. And that was at 3 Joint Appendix 76. Counsel said that Engage had produced quote, all of the databases, end quote. More specifically, we understand that the programming plaintiffs admit they received the databases from Engage in 2014 and 2015. Some of these were preserved and predate the litigation. And they also received three versions of the database in October 2015 with the repository files that could show were there changes in the software over time and they haven't been able to present any evidence to suggest what we found in those files suggests that certain aspects of prior iterations of the database were deleted or that there was any foul play. And so the case that they rely on, Sentis from this court in 2014, is actually completely in a posit. There was evidence, I believe it was the plaintiff who allegedly had been involved in withholding evidence that was ultimately lost. And the Court of Appeals noted that there were numerous instances where counsel and the party had not been forthright as to who had the financial information for that client. And I think they recommended a different accountant. And so the answer kept changing as to where the information was and then by the time they get to the actual accountant who supposedly had the laptop with these financial forms on it, it was gone. And so there was specific conduct and evidence of misconduct by that party that justified the viewing of control there. And as the district court found below, as we stress in our briefing, there's been no evidence that any of the other defendants have done anything with regards to discovery that constitutes a discovery violation. This is, again, their group pleading tactic. They want to say because there was one specific instance of a problem with Engage's producing of this evidence over a certain period of time, which the district court was well aware of and documented, that somehow that instance shows intentional discovery violations in control by all the defendants. There's simply no evidence of that. So a couple of quick additional points here at the end. The district court did the holistic analysis of the four aspects of the BIVI and SEVA web stores. It went through the field names in the product table where eight of the 64 field names were the same. So that's not minimally creative. It went through the numbering of the image JPEGs, citing Toro and West Publishing, just giving something a number and a file name, that's not minimally creative. It went through the access rights values. That's something that possibly could have been a creative choice, but here it wasn't, because which employees were eligible to purchase or select which marketing materials products, that was set by the defendants. It was their employees. They knew which products those employees could access. And the same thing for the quantity limitations. There was nothing minimally creative there. And the district court says at pages 19 through 21 of its opinion on those latter two aspects, programming plaintiffs have asked us to look at it in a holistic manner, to see how this data interacts with one another. In citing Schoolhouse, in citing Feist, the court said there's nothing minimally creative here. The programming plaintiffs are not making creative choices about how to link specific products or specific file names with specific customers. So then there's no way to look at it holistically and say that even though none of those individually are creative, the whole thing is? Well, that's what had been submitted to the district court that they thought was minimally creative, and that's why the district court said it was not. There was nothing that's creative in the selection of which bits of data went with which files. And I understood that he was saying you've got to step back a little bit and look holistically the way this works is creative. Your Honor, to this day we still don't know what that creativity is. It's the defendant's products, it's their names, it's their restaurants, it's their dishes. We have a new print shop essentially for the menu here that has the same items. And that's not minimally creative. We know that from this Court's Reagan decision. We ask this Court to refer. Thank you. May it please the Court. Dan Blagan for Western Reubenew. I'll be arguing the contingent cross appeal very briefly. If you have any questions, we'd love to hear them. First, it's Western Reubenew's position that the Court should not reach this contingent cross appeal for the reasons already addressed in the papers and by counsel. If the summary judgment issue on the copyright is affirmed, it's a moot point. The question of whether Mr. Burry was an employee of Western Reubenew at the time of creation is irrelevant at that point and the contingent cross appeal is moot. But the question before the Court here is whether summary judgment on that issue of employment in the context of copyright ownership was appropriately decided by the District Court given the conflicting and disputed evidence which the Court found as it went through the 12 read elements. It found that there was evidence on both sides on many of them and ultimately decided that Mr. Burry was not an employee for read purposes, for copyright ownership purposes, that we believe that that issue should be remanded for further consideration on the facts because there was quite a bit of dispute on the facts. So, viewing the evidence alike most favorable to my client, there was just insufficient evidence to make the conclusion at summary judgment that Mr. Burry was an employee. It is a particularly fact-intensive case in question because of quite a bit of the evidence was a matter of perspective. It was conflicting evidence as we cite in the record on why, like for the 1099 question, why was it a 1099 and not a W-2 like his siblings? All the history of that had a lot of the he said, she said issues that were presented to the Court and we believe that he improvidently granted summary judgment on the issue. I do want to address briefly though the main thrust of the opposition of this particular issue has to do with collateral estoppel and it is important to note, and again this is the lumping together of lots of different things. The state court decision first was after the fact and was not considered that evidence, that information was not before the judge. And we don't believe that as the appellants would argue that the collateral estoppel applies. Those are two very different questions. A jury deciding the joint venture factors under Missouri law between Toobaroo and Western Roubideau is not at all the same identical issue of the Reed factors of copyright ownership under the Supreme Court decision in Reed which has significantly different issues that are being addressed. If there are no questions, however, I will see you in the last four seconds. Thank you. Mr. Keenan, we ate into a lot of your rebuttal time, but I'll allow you three minutes if that's helpful. Thank you, Your Honors. I want to stress first the question about whether or not we got all the databases. So there was a lag. The database that we got, the earliest one was December of 2014, but on March 15, 2014, that's when the email from Nathan Haley of Engage to Darren Clausen of Engage said the design replication has been complete. So whatever happened between then and the earliest database that we could find, we have not been able to get back to that first initial database that dates back to March regarding the spoliation issue. I just want to address the creative choices of referential integrity. I do want to stress that in defendant's statement of uncontroverted fact, they said quote, the relationship amongst the tables referential integrity in a database is part of the creative expression within a database. So we do think that there are creative decisions being made when one is drawing relational decisions across tables and we think pragmatically those creative decisions are why it was more valuable and worth their while to take it. What is referential integrity? Is that just assigning a random number to a product? No, Your Honor. It's assigning a number that the specific purpose is to draw them together. It's not random because it's chosen for the very specific purpose of creating connections between different aspects of different tables. So it's not random as in the Toro case and it's also not demanded of numerical necessity or alphabetical purpose of drawing a connection between various things throughout many, many, many databases or many, many tables. I'd also like to stress that we think Reagan helps us because that's exactly what database keys and inferential referential integrity does. It takes all this information and it conveys something very different and much more useful. That's why it's useful to businesses because it's conveying information that they're not otherwise getting. So it's not just creative in a more colloquial sense but it's conveying useful information, qualitatively significant information. And if I could just touch on Your Honor's question about is a database all by itself like a standalone database sufficiently creative. I want to read a quote from Infogroup where they talked about this. It was this court saying a process where someone merges overlapping data and purges inaccurate or unuseful data in its judgment entails a minimal degree of creativity. They use their judgment in selecting what names and addresses to even include in the database. So even just a standalone database can be creative enough and once you put in database keys and referential integrity, that's the value of the system That's the creative choice and I think that's why the other side spent so much money and effort and time to get at it. Thank you. Thank you very much. Thank you counsel. The court appreciates your appearance and arguments. Complicated case. It's submitted and we'll issue an opinion in due course.